IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No 14-cv-02878-RBJ

AMERICAN HUMANIST ASSOCIATION, INC.,
JOHN DOE, individually, and as parent and next friend of DOE CHILD-1 and DOE CHILD-2,
minors;
DOE CHILD-1, a minor,
DOE CHILD-2, a minor,
JACK ROE, individually and as a parent on behalf of a minor,
JILL ROE, individually and as parent on behalf of a minor, and
JANE ZOE, individually and as parent on behalf of a minor,

      Plaintiffs,

v.

DOUGLAS COUNTY SCHOOL DISTRICT RE-1,
DOUGLAS COUNTY BOARD OF EDUCATION,
ELIZABETH CELANIA-FAGEN, in her official capacity as Superintendent of Douglas County
School District,
JOHN GUTIERREZ, in his official capacity as Principal of Cougar Run Elementary School,
JERRY GOINGS, in his official capacity as Principal of Highlands Ranch High School,
MICHAEL MUNIER, in his individual capacity,
WENDY KOCESKI, in her official capacity as Elementary Principal of SkyView Academy, and
LISA NOLAN, in her official capacity as Executive Director of SkyView Academy,

      Defendants.

---

# ORDER

---

Plaintiffs complain that the Douglas County School Board and related entities and
individuals are unlawfully promoting Christian religion in the County's public schools. All
parties have moved for summary judgment. Because the Court finds that none of the plaintiffs
who have brought the suit have legal standing to do so, it does not address the merits of the
claims. Plaintiffs' motion is denied, and defendants' motion is granted.

# BACKGROUND

The following facts are undisputed except where otherwise noted.  Plaintiff American Humanist Association, Inc. (AHA) is a nonprofit organization that promotes the "separation of church and state and the constitutional rights of humanists, atheists and other freethinkers."  ECF No. 1 at ¶ 5.  AHA brings this suit to "assert the First Amendment rights of its members."  *Id.*  Plaintiffs John Doe, Jill Roe, and Jane Zoe are individual members of AHA.  ECF No. 59 at 3.

Doe Plaintiffs.  John Doe brings this claim individually and as a parent of his minor children.  The Doe children, both of whom were individually named as plaintiffs, attend SkyView Academy, a charter school within the Douglas County School District.  ECF Nos. 47 at 2 n.2; 50 at 3.

Roe Plaintiffs.  Jack and Jill Roe have two children who attend schools within the District.  ECF No. 47 at 2 n.2.  Their children were not individually named as plaintiffs.  Roe Son is a student at Douglas County High School, and Roe Daughter attends Aspen View Academy, a charter school.  ECF No. 50 at 3.

Zoe Plaintiff.  Jane Zoe has two children who attend Cougar Run Elementary School.  ECF No. 47 at 2 n.2.  The children were not individually named as plaintiffs.  During the 2013–2014 school year Zoe Son was enrolled in preschool teacher Cammile Espinosa's class.  ECF No. 50 at 3.  Ms. Zoe later enrolled her younger child (Zoe Daughter) in Ms. Espinosa's preschool class.  ECF No. 50 at 7.

Plaintiffs name a number of defendants.  The Douglas County School District (sometimes referred to herein as "the District" or as "DCSD") is a large public-school district in the greater Denver area.  ECF No. 50 at 2.  The District is run by the Douglas County School Board which has seven elected members.  *Id.*  Elizabeth Celania-Fagen is the superintendent of the District.

*Id.* John Gutierrez is the principal of Cougar Run Elementary School. *Id.* Jerry Goings is the principal of Highlands Ranch High School. *Id.* Michael Munier and Wendy Koceski are the former and present elementary principals of SkyView Academy, and Lisa Nolan is SkyView's executive director. However, plaintiffs' claims against Mr. Munier were voluntarily dismissed shortly after the Complaint was filed, and the parties later settled plaintiffs' claims against Ms. Koceski and Ms. Nolan. Thus, all claims against the individual SkyView defendants have been dismissed with prejudice. ECF Nos. 35 at 2; 36 at 2; 50 at 4.[1]

Plaintiffs filed this case out of concern about religious events and activities that have occurred at various schools within the District. They allege violations of the Establishment Clause of the First Amendment of the United States Constitution and the Equal Access Act, 20 U.S.C. §§ 4071–4074. ECF No 47 at 2.

### Operation Christmas Child.

In July 2014 Mr. Doe contacted Mr. Roe to "discuss pursuing litigation against SkyView and DCSD." ECF No. 50 at 3. Mr. Doe was concerned about Operation Christmas Child (OCC) activities at SkyView. *Id.* Samaritan's Purse, "an evangelistic Christian organization," sponsors OCC. ECF No. 47 at 6. OCC boxes are taken to "processing" centers where Christian materials, including booklets and other literature, are added to them. *Id.* OCC collects items to be placed in shoeboxes "to be sent to needy children around the world." ECF No. 50 at 8.

A number of schools within the District, including Douglas County High School and SkyView Academy, have participated in OCC. ECF No. 47 at 6. In 2014 "DCHS teachers

---

[1] A charter school is a public school of the school district that approves its charter application and enters into a charter contract with the school. C.R.S. § 20-30.5-104(2)(b). It is subject to accreditation by the district. *Id.* However, it is responsible for its own operation and may sue and be sued in its own name. *Id.* § 7(a), (b). Defendants argue that charter schools are independent of the district such that claims based on activities arising at a charter school must be brought against the school, not the district. *E.g.*, ECF No. 50 at 10. Plaintiffs do not comment on the independence of charter schools as such. However, after noting the dismissal of the claims involving SkyView's personnel, plaintiffs state that "SkyView's involvement is only relevant insofar as it shows Defendant was on notice." ECF No. 58 at 4 n.14.

organized OCC in a 90-minute 'homeroom' class" for freshman at DCHS. *Id.* at 7–8; ECF No. 47-3 at 12. OCC activities at the other schools "generally included teachers organizing OCC during class, using school email and newsletters to promote OCC, and bringing in supplies for student [sic] to pack boxes." ECF No. 47 at 8.

<u>Fellowship of Christian Athletes Trip to Guatemala.</u>

In March 2014 Amanda Berry, a student at Highland Ranch High School, organized a trip to Guatemala. ECF No. 50 at 4. Ms. Berry and the other students involved in the efforts were members of the school's chapter of the Fellowship of Christian Athletes (FCA). *Id.* The FCA is "a Christian organization with clubs in many schools." ECF No 47 at 2. Ms. Berry contacted the Christian organization "Adventures in Missions" (AIM), and AIM "planned all Guatemala Trip activities." ECF Nos. 47 at 2; 50 at 4. Fourteen students traveled to Guatemala over spring break. ECF No. 47 at 2. Two HRHS teachers, Alexandra Malach and Bradley Odice, chaperoned the trip. *Id.* All of the participants, including the chaperones, paid their own way. ECF No. 50 at 5. One goal of the trip was to "introduce [children] to the Bible" and "promote Christianity." ECF No. 47 at 2.

Ms. Malach created "fundraising flyers" to raise money for the trip. *Id.* at 4. Ms. Berry also organized fundraising events including babysitting nights and a pancake breakfast. ECF No. 50 at 5. Cougar Run Elementary School participated in some of the fundraising efforts. ECF No. 47 at 4. For example, Cougar Run "partnered" with FCA to "organize school-wide fundraisers for the mission trip." *Id.* FCA students delivered fundraising flyers to Cougar Run and other elementary schools. ECF No. 50 at 5. Cougar Run placed the flyers in students' "take-home" folders. *Id.* Additionally, Cougar Run teacher Micki Benge volunteered to have her sixth-grade class organize a "supply drive" to benefit the Guatemala trip. ECF No. 47 at 5.

4

Ms. Benge printed a flyer "promoting the Mission Trip to parents" and sent it home in student

folders. *Id*. Ms. Zoe received one of the flyers in her son's folder, which asked Zoe Son and his

class to donate "temporary tattoos." *Id*. Additionally, Zoe Son's preschool teacher Ms. Espinosa

emailed the parents of children in her class to encourage their participation in the supply drive.

*Id*. The email indicated that Cougar Run is "partnering with HRHS on this effort – specifically

the FCA (Fellowship of Christian Athletes) organization." *Id*. Principal Gutierrez also emailed

Cougar Run families asking for monetary donations. *Id.*

<u>Faculty Participation in Fellowship of Christian Athletes.</u>

Plaintiffs raise concerns about teachers and school staff participating with FCA chapters

at numerous schools. ECF No. 47 at 8. Plaintiffs specify that "faculty throughout the District

participate in FCA meetings and pray with students, serve as *the* FCA contact person, write

letters on behalf of FCA with school letterhead . . . organize FCA events  . . . promote FCA

football camps, and even *initiate* FCA clubs." ECF No. 58 at 13 (emphasis in original). At some

schools, "FCA was initiated by staff without any student initiation of any kind." ECF No. 47 at

9.

<u>Other Religious Events and Activities.</u>

Plaintiffs describe other activities and events around the District. Several schools were

involved in a "Belize Mission Trip" in 2014. ECF No. 1 at ¶¶ 217-31. Although not mentioned

in the Complaint, plaintiffs' motion for summary judgment states that in 2012 the Rockridge

Elementary School held fundraisers for the Tim Tebow Foundation, which is a "registered

Christian charity." ECF No. 47 at 8. Additionally, HRHS faculty and students participate in an

"annual prayer event" called "See You at the Pole" (SYATP) that occurs before school starts. *Id.*

at 10. Finally, plaintiffs state that "the District endorsed and promoted two religious summer

football camps" that were cosponsored by FCA.  *Id.*  The latter statements, at least, appear to be incorrect.  Defendants indicate that one of these camps never happened, and the one that did occur was "not associated with the District in any way."  ECF No. 59 at 15.

## DISCUSSION

### I.      Standard of Review.

The Court may grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party has the burden to show that there is an absence of evidence to support the nonmoving party's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  The nonmoving party must "designate specific facts showing that there is a genuine issue for trial."  *Id.* at 324.  A fact is material "if under the substantive law it is essential to the proper disposition of the claim."  *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248. The Court will examine the factual record and make reasonable inferences therefrom in the light most favorable to the nonmoving party.  *Concrete Works of Colorado, Inc. v. City & Cnty. of Denver*, 36 F.3d 1513, 1517 (10th Cir. 1994).

### II.     Defendants' Motion for Summary Judgment.

Defendants move for summary judgment on the theory that plaintiffs do not have standing to bring either of their claims, and that even if plaintiffs did have standing, defendants would be entitled to judgment as a matter of law on both the Establishment Clause and Equal Access Act claims.  ECF No. 50 at 1.  For the reasons described below, the Court finds that the claims of one plaintiff family are moot, and that the remaining plaintiffs do not have standing.

**A. Justiciability – Generally.**

Article III of the United States Constitution limits the judicial power of the federal courts to the resolution of "cases or controversies." *Allen v. Wright,* 468 U.S. 737, 750 (1984), *abrogated on other grounds by Lexmark Intern., Inc. v. Static Control Components, Inc.,* 134 S.Ct. 1377 (2014). To satisfy this requirement, "a litigant must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision." *Chafin v. Chafin,* 133 S.Ct. 1017, 1023 (2013) (internal quotations omitted). "This case-or-controversy requirement subsists through all stages of federal judicial proceedings, trial and appellate." *Lewis v. Cont'l Bank Corp.,* 494 U.S. 472, 477 (1990). As relevant here, the case or controversy requirement includes the doctrines of mootness and standing. *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.,* 528 U.S. 167, 180 (2000).

1. Mootness – The Doe Family's Claims.

"A suit becomes moot, when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." *Chafin*, 133 S.Ct. at 1023 (internal citations and quotations omitted). This occurs "only when it is impossible for a court to grant any effectual relief whatever to the prevailing party." *Id.* "[I]t is not enough that a dispute was very much alive when suit was filed; the parties must continue to have a personal stake in the ultimate disposition of the lawsuit." *Id.* (internal citations and quotations omitted).

On April 21, 2015, the parties filed a joint motion to dismiss the claims against the remaining SkyView defendants, ECF No. 35, which the Court granted the following day. ECF No. 36. In their motion, the parties acknowledged that "this case involves multiple claims

against two distinct party groups – the School District Defendants and the SkyView Defendants," and "the issues against each party group are separable and distinct."  ECF No. 35 at ¶ 6.

The operation of OCC at SkyView, where the Doe children go to school, was the only alleged violation that directly affected the Doe family.  While the Doe family might still have general concerns about religious activities within the District, it no longer has a concrete interest in this case.  *See Ellis v. Railway Clerks,* 466 U.S. 435, 442 (1984).  Because the Doe family no longer has an injury for which this Court could award relief, the Court holds that its claims are moot and will not discuss them further except where applicable in contextualizing the remaining plaintiffs' claims.

   2.  Standing – Generally.

The remaining plaintiffs' chief justiciability obstacle is whether they have standing to sue.  Standing involves both prudential and constitutional requirements, but "the core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III."  *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 (1992) (internal citation omitted).  At minimum, plaintiffs must establish they have a "personal stake" in the claim, which ensures that the parties to the case are actually adverse to each other.  *Baker v. Carr*, 369 U.S. 186, 204 (1962).

To establish constitutional standing, a plaintiff must demonstrate an "injury in fact" that is "fairly traceable" to the challenged action of the defendant and that will likely be redressed by a favorable decision of the court.  *Lujan,* 504 U.S. at 560–61.  To sufficiently allege an injury in fact, a plaintiff must demonstrate "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical."  *U.S. v. Windsor,* 133 S.Ct. 2675, 2685 (2013) (internal quotations and citations omitted).  As the party

seeking federal jurisdiction, plaintiffs have the burden of establishing the elements of constitutional standing. *Nova Health Systems v. Gandy,* 416 F.3d 1149, 1154–55 (10th Cir. 2005). At the summary judgment stage, plaintiffs "must set forth by affidavit or other evidence specific facts that, if taken as true, establish each of these elements." *Id.* (internal citation omitted). "A federal court is powerless to create its own jurisdiction by embellishing otherwise deficient allegations of standing." *Whitmore v. Arkansas,* 495 U.S. 149, 155–56 (1990).

In addition to these constitutional requirements, plaintiffs must also satisfy a number of prudential principles. *See Valley Forge Christian Coll. v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 474–75 (1982). First, a plaintiff must "assert his own legal rights and interests" and not those of a third party. *Warth v. Seldin,* 422 U.S. 490, 499 (1975). Additionally, the Court must refrain from adjudicating a "generalized grievance" that many people share and that is more properly addressed by the other branches of government. *Id.* Finally, a plaintiff's grievance must fall "within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Valley Forge*, 454 U.S. at 475.

I first consider whether plaintiffs have standing as individuals to bring either their Establishment Clause or Equal Access Act claims. I then analyze whether plaintiffs have standing as taxpayers. Finally, I look at whether the AHA has associational standing.

**B. Individual Standing – Establishment Clause.**

Plaintiffs argue that defendants are involved in "widespread, flagrant, and acknowledged religious practices" that violate the Establishment Clause. ECF No. 47 at 22. The Establishment Clause provides that "Congress shall make no law respecting an establishment of religion." U.S. Const. amend. I. The Fourteenth Amendment extends this prohibition to "the legislative power of the States and their political subdivisions." *Santa Fe Indep. Sch. Dist. v. Doe,* 530 U.S. 290,

301 (2000).  Public schools qualify as political subdivisions of the state.  *See Bauchman for Bauchman v. West High School,* 132 F.3d 542, 550 (10th Cir. 1997).  "At its core, the Establishment Clause enshrines the principle that government may not act in ways that aid one religion, aid all religions, or prefer one religion over another."  *Snyder v. Murray City Corp.,* 159 F.3d 1227, 1230 (10th Cir. 1998) (internal citations and quotations omitted).

An injury to an individual's "[n]on-economic religious values" can confer standing in Establishment Clause cases.  *O'Connor v. Washburn Univ.,* 416 F.3d 1216, 1222 (10th Cir. 2005) (internal citation omitted).  For example, the Supreme Court has recognized parents' constitutionally-protected interest in guiding "the religious future and education of their children."  *Wisconsin v. Yoder,* 406 U.S. 205, 232 (1972).  Parents can have standing to challenge religious activities in schools due to a concern that "impressionable schoolchildren" might be "subjected to unwelcome religious exercises" or "forced to assume special burdens to avoid them."  *Valley Forge,* 454 U.S. at 486 n.22.

The Tenth Circuit has held that an allegation of "personal and unwelcome contact with government-sponsored religious symbols is sufficient to establish standing."  *Awad v. Ziriax,* 670 F.3d 1111, 1122 (10th Cir. 2012) (internal quotations and citations omitted).  However, it is "not enough for litigants to claim a constitutional violation."  *Id.*  They must identify a "personal injury suffered by them *as a consequence* of the alleged constitutional error."  *Valley Forge,* 454 U.S. at 485 (emphasis in original).  Parents must demonstrate that their children "are *directly affected* by the laws and practices against which their complaints are directed."  *Abington Sch. Dist. v. Schempp,* 374 U.S. 203, 224 n.9 (1963) (emphasis added).  The alleged injury must be more "than the psychological consequence presumably produced by observation of conduct with which one disagrees."  *Awad*, 670 F.3d at 1121.

In the present case, plaintiffs claim they have standing because "[d]efendant's policies and practices . . . pervade the whole system, injuring each Plaintiff's interest, as a parent and taxpayer."[2]  ECF No. 58 at 16.  Plaintiffs spend a great deal of time focusing on events and activities that occurred at schools where plaintiffs' children do not attend and with which none of the families had any direct contact.  For example, much of the discussion is about OCC, particularly at Chaparral High School where no plaintiff students attend.  *See* ECF No. 47 at 6–7. While such activities and events might have Establishment Clause implications, they do not directly impact *these* plaintiffs, and the Court need not consider them for standing purposes.  The Court will focus on whether the Roes, Ms. Zoe, or their respective children were directly affected by the events in question, thereby establishing an injury in fact.

1.  The Roes at Douglas County High School.

Plaintiffs argue that the Roes are "directly injured by Defendant's District-wide policies in a concrete and immediate way."  ECF No. 58 at 17.  However, plaintiffs do not offer evidence to support their claim that the alleged Establishment Clause violations actually injured the Roes. In fact, Mr. Roe stated that he "can't speak to [the events in question] with knowledge."  Jack Roe Dep. ECF No. 58-3 at 21:3–13.  For example, plaintiffs claim that "DCHS teachers organized OCC in a 90-minute 'homeroom' class that meets every other day."  ECF No. 47 at 7– 8.  This is a "Freshman Transition Class."  ECF No. 47-3 at 12.  However, Roe Son is a senior at

---

[2] Plaintiffs claim that "system-wide relief is required if the injury is the result of violations . . . that are attributable to policies or practices *pervading the whole system.*"  ECF 58 at 16 (quoting *Armstrong v. Davis,* 275 F.3d 849, 870 (9th Cir. 2001)) (emphasis added by plaintiffs).  Unfortunately, plaintiffs are taking case law out of context.  This quotation from a Ninth Circuit case is misleading: it is excerpted from the panel's discussion of the appropriate scope of injunctive relief after "the district court's extensive findings of fact setting forth in meticulous detail the injuries suffered by" multiple plaintiffs. *Armstrong,* 275 F.3d at 871.  Plaintiffs seem to suggest that the allegedly pervasive nature of violations throughout DCSD affords them standing to seek "system-wide relief" and excuses them from proving an individual injury.  This notion would erode one of the basic precepts of standing: the individual plaintiff must suffer a personal and cognizable injury.  No matter how pervasive the alleged violations, the individual plaintiff still bears the burden of alleging how the challenged actions injure him.

DCHS, so the introduction of OCC to DCHS freshman homeroom classes did not impact him. ECF No. 58-5 at ¶ 3.  Neither Roe Son nor his parents had any personal contact with OCC—he never participated in it nor was he asked to participate.  ECF No. 50 at 3; Jill Roe Dep. ECF No. 58-4 at 34:18–22.

Additionally, plaintiffs make multiple allegations regarding FCA activities at DCHS. They claim that the FCA faculty advisor "makes announcements for FCA, serves as its point of contact, talks to parents about FCA using 'we' and 'our,' and seeks out speakers for FCA meetings."  ECF No 58 at 17.  Additionally, plaintiffs point to the "religious football camp" that DCHS staff "promoted" in 2014.  *Id*.  However, plaintiffs do not allege that Roe Son had any contact with the FCA, or that the involvement of DCHS teachers in FCA activities impacted him in any way.

Plaintiffs claim that the Roes are susceptible to future injury because "[t]he District states these practices are consistent with DCSD policy," and the Roes' daughter will attend DCHS in 2017.  ECF No. 58 at 17.  Plaintiffs state that "[the] Roes can reasonably expect [the practices] to continue when their daughter attends DCHS."  *Id.*  Mrs. Roe is concerned that her children might "feel like outsiders" if the conduct at DCHS continues.  Jill Roe Dep. ECF No. 58-4 at 30:8–13. Under certain circumstances, allegations of future injury can satisfy the injury requirement for standing.  However, "[a]llegations of *possible* future injury do not satisfy the requirements of Art. III.  A threatened injury must be *certainly impending* to constitute injury in fact."  *Whitmore,* 495 U.S. at 158 (internal quotations and citations omitted) (emphasis added); *see also Essence, Inc. v. City of Federal Heights,* 285 F.3d 1272, 1282 (10th Cir.2002) ("The threat of injury must be both real and immediate.") (internal quotation and citation omitted).  There is no evidence

here that injury to the Roes' daughter is certainly impending or that the Roes' concern about future injury is more than just a mere possibility.

In sum, it appears that the Roes are trying to vindicate their general religious beliefs. *See, e.g.,* Jill Roe Dep. ECF No. 58-4 at 47:10–14 ("I'm here trying to get the school district to stop spreading their religious propaganda in the public school system.").  In fact, the Roes decided to join the lawsuit only after hearing Mr. Doe's concerns about the "religious fundraising" activities at SkyView and not because of any specific concern about events at the schools their children attend.  Jack Roe Dep. ECF No. 50-14 at 9:10 –10:6; Jill Roe Dep. ECF No. 50-12 at 10:15– 11:6.  The Court does not in any way question the sincerity of the Roes' concerns.  But as mentioned above, the psychological impact from observing disagreeable conduct is insufficient to confer standing.  The Roes have not established that they suffered an injury in fact.

2.  <u>Ms. Zoe at Cougar Run Elementary School.</u>

Ms. Zoe had personal contact with the alleged violations on only two occasions, both of which related to Cougar Run's fundraising efforts for the HRHS Guatemala trip.  First, Ms. Zoe received one of Ms. Benge's flyers about the supply drive in Zoe Son's take-home flyer.  ECF No. 50 at 6.  Second, she received an email that contained the "Giving to Guatemala" flyer.  *Id.* at 6–7.  In response, Ms. Zoe contacted AHA out of a concern about a "culture of religion being promoted at Douglas County schools."  *Id.* at 6.

Ms. Zoe offers a number of statements about how the request to participate in the fundraisers affected her and her son.  She attests that "I feel like an outsider, and it shouldn't be that way."  Jane Zoe Dep. ECF No. 58-2 at 62:25–63:1.  She also states "my child felt coerced into participating and contributing to this religious fundraiser."  *Id.* at 32: 1–4.  Ms. Zoe attributes the coercion to the fact that "a lot of his peers [were] contributing to [the fundraising],"

and that his parents told him "we're not going to participate." *Id.* at 32: 5–9.  Ms. Zoe admits that Cougar Run staff did not penalize or retaliate against Zoe Son because he did not participate in the fundraiser.  *Id.* at 26:12–27:4.  No "adverse actions" were taken against him because he did not donate temporary tattoos.  *Id.* at 27:2–4.

In support of their claim that Ms. Zoe has standing, plaintiffs cite *Bell v. Little Axe Independent School District No. 70,* 766 F.2d 1391 (10th Cir. 1985).  ECF No. 58 at 17.  In *Bell,* the court found that parents had standing to challenge religious activities at their children's school, including religious meetings held on school grounds.  *Id.* at 1399.  The meetings occurred weekly and were promoted through school publications and posters in the halls.  *Id.* at 1396–97.  The *Bell* plaintiffs had prolonged exposure to the weekly meetings.  Here, however, Ms. Zoe only received one flyer and one email about a fundraising effort for a one-time trip to Guatemala.  Additionally, in other cases addressing standing to bring an Establishment Clause claim, the Tenth Circuit has found an injury in fact due to personal contact with religious images where the exposure to the religious activity had a degree of constancy or conspicuousness that is lacking in Ms. Zoe's case.  *See Weinbaum v. City of Las Cruces, N.M.,* 541 F.3d 1017, 1028 (10th Cir. 2008) (finding an injury in fact based on allegations that the public display of a religious symbol "directly affects [the plaintiffs] because the use is conspicuous," and that the "constant exposure" to the symbol is "a constant reminder" that plaintiff and his son are "less that [sic] fully accepted in the community and in the schools."); *Foremaster v. City of St. George,* 882 F.2d 1485, 1491 (10th Cir. 1989) (plaintiff had standing to challenge the city's use of a religious logo where the plaintiff had "pervasive contact" with the logo, "frequent and close connection" to it, and was "directly confronted by the logo on a daily basis.").

It is not clear to the Court that Ms. Zoe or Zoe Son suffered a cognizable injury. However, even if Ms. Zoe's concerns about being an outsider or her son's experiencing coercion did amount to an injury in fact, the Court finds that she does not have standing because the alleged injuries are not "fairly traceable" to the challenged actions and activities." *Allen v. Wright,* 468 U.S. 737, 751 (1984), *abrogated on other grounds by Lexmark Intern., Inc. v. Static Control Components, Inc.,* 134 S.Ct. 1377 (2014). The "fairly traceable" requirement "examines the causal connection between the assertedly unlawful conduct and the alleged injury." *Id.* at 753 n.19. The "traceability of a plaintiff's harm to the defendant's actions need not rise to the level of proximate causation," but a plaintiff must offer "proof of a substantial likelihood that the defendant's conduct caused plaintiff's injury in fact." *Habecker v. Town of Estes Park, Colo.,* 518 F.3d 1217, 1225 (10th Cir. 2008) (internal citations omitted). "If speculative inferences are necessary to connect [a plaintiff's] injury to the challenged action, this burden has not been met." *Id.* (internal citations and quotations omitted).

Ms. Zoe does not offer sufficient evidence to show that the request to participate in the fundraiser caused her and her son to feel coercion or stigmatization. Ms. Zoe alleges that Zoe Son has had negative interactions with other children about religion. She states that he has told her that "other kids [at school] are wanting him to believe in God." Jane Zoe Dep. ECF No. 58-2 at 62:3–5. She adds that she has "seen kids yell at him." *Id.* at 62:21–22. Specifically, she says that "a neighbor kid yelled at him saying, 'Why don't you believe in God?'" *Id.* at 62:21–23. She attributes these actions to the DCSD's "culture of religion" in schools. *Id.* at 15:13–14; 61:16–19; 62:23–24. Other than ascribing these events to DCSD's general environment, Ms. Zoe does not offer any evidence that ties the treatment of her son to the fundraising efforts at Cougar Run. In contrast, the *Bell* plaintiffs alleged that other students accused their children of

not believing in God because they did not attend the religious meetings.  *Bell,* 766 F.2d at 1396.

The other students' treatment of the *Bell* plaintiffs' children was directly linked to the meetings

held on school grounds.  Additionally, after the *Bell* plaintiffs filed their lawsuit, they received

threats and experienced bullying.  *Id.* at 1397.  This negative treatment was also casually

connected to the plaintiffs' challenge to the religious activities in the school.

The Court acknowledges that the other children's comments to Zoe Son are unkind and

potentially injurious.  However, despite the troubling nature of these interactions among kids, the

Court would need to make a series of "speculative inferences" to conclude that other children

treated Zoe Son poorly because of the events surrounding the fundraising drive.  The Court will

not take such inferential leaps.  Ms. Zoe has not sufficiently alleged that her injury is fairly

traceable to the defendants' conduct.  In the absence of this causal link, she has no standing.

C.  **Individual Standing – Equal Access Act**.

Plaintiffs also claim that defendants have violated the Equal Access Act (EAA).  ECF

No. 47 at 21.  The EAA applies to any public secondary school that receives federal financial

assistance and has a "limited open forum."  20 U.S.C. § 4071(a).  A limited open forum is "an

offering to or opportunity for one or more noncurriculum related student groups to meet on

school premises during noninstructional time."  *Id.* at § 4071(b).  Public schools that provide a

limited open forum may not "deny equal access or a fair opportunity to, or discriminate against,

any students who wish to conduct a meeting within that limited open forum on the basis of the

religious, political, philosophical, or other content of the speech at such meetings."  *Id.* at §

4071(a).

The statute essentially requires that these schools either grant official recognition and

associated rights and privileges only to student groups that are directly related to the body of

courses offered by the school (a "closed forum") or, if such recognition and privileges are granted to any noncurriculum related student group, then equal access must be extended to all such groups. *See Palmer High School Gay/Straight Alliance v. Colorado Springs School Dist. 11,* No. Civ.A.03-M-2535, 2005 WL 3244049, at *2 (D. Colo. 2005). The school cannot deny equal access to school facilities on the basis of the focus or viewpoint of the student group. *Board of Educ. of Westside Community Schools v. Mergens By and Through Mergens,* 496 U.S. 226, 245 (1990). Congress intended to "develop legislation that respects both the Establishment Clause and the Free Exercise and Free Speech Clauses of the First Amendment[.]" 130 Cong. Rec. 23, 32316 (1984). The Supreme Court has interpreted the legislative intent to "address perceived widespread discrimination against religious speech in public schools." *Mergens,* 496 U.S. at 239.

In order to bring their EAA claim, plaintiffs must establish statutory standing, which differs from Article III standing. "[A] statutory cause of action extends only to plaintiffs whose interests fall within the zone of interests protected by the law invoked." *Lexmark Intern., Inc. v. Static Control Components, Inc.,* 134 S.Ct. 1377, 1388 (2014) (internal quotations and citations omitted). "[T]he question of whether a party 'falls within the class of plaintiffs whom Congress has authorized to sue' under a particular statute . . . is a question of statutory interpretation." *Niemi v. Lasshofer,* 770 F.3d 1331, 1344 (10th Cir. 2014) (internal quotation and citations omitted).

Plaintiffs argue that they "fall squarely within the 'zone of interest' of the EAA provisions that prohibit religious endorsement." ECF No. 58 at 18. I disagree. The EAA's plain language and legislative history demonstrate that Congress provided a remedy to a distinct class of plaintiffs. Even when construing facts and inferences in plaintiffs' favor, the individuals

named as plaintiffs in the present case do not have standing to sue under this statute because they do not share the interests that Congress intended to protect.

To begin, the statute only applies to students enrolled in federally-funded public secondary schools. § 4071(a). In Colorado, a secondary school is a "public middle, junior, or high school." C.R.S. § 22-91-102. With the exception of Roe Son who is a student at DCHS, none of the remaining plaintiffs' children is a secondary school student.[3] Cougar Run is an elementary school, so it falls outside the coverage of the EAA. Therefore, Ms. Zoe, whose children attend Cougar Run, does not have standing to sue under the EAA. Accordingly, the Court will consider plaintiffs' allegations about the EAA only as they relate to Roe Son and his parents.

The plain language and legislative history demonstrate a congressional intent to create a remedy for students and student groups who were denied access to a school's limited open forum. *See Mergens,* 496 U.S. at 235. Plaintiffs do not allege that Roe Son falls into such a group of individuals. They do not offer any evidence that Roe Son was ever denied equal access to DCHS' limited open forum. Roe Son participated in volleyball and mock trial at DCHS. Jack Roe Dep. ECF No. 58-3 at 54:24 –55:1. Regarding whether Roe Son was ever "denied access to meeting space" at DCHS, Mr. Roe states that he does not know because he is "not close enough to be able to answer that [question regarding Roe Son's] activities at school." Jack Roe Dep. ECF No. 58-3 at 55:2–6. The only time Mr. Roe recalls his son's having trouble with accessing the school's facilities is when Mr. Roe received "an e-mail that [the volleyball team] was unable to practice volleyball because another group was using the facilities." *Id.* at 55: 9–12. The Roes offer no evidence that this was anything more than a one-time scheduling snafu.

---

[3] As mentioned above, the Doe Family's claims are moot and are not considered here.

Plaintiffs focus their EAA allegations on teacher and staff participation in religious groups and activities. ECF No. 47 at 21. They argue that "Roes' standing is particularly strong because numerous EAA violations occur at DCHS." ECF No. 58 at 20. Plaintiffs claim that "[i]t is irrefutable that faculty 'participate' in FCA; some even run the clubs, violating the express terms of the EAA." ECF No. 47 at 21. Plaintiffs' focus on faculty involvement with religious groups is not relevant to whether the Roes suffered an individual injury that is actionable under the EAA, namely whether Roe Son was involved in a student group that was denied a fair opportunity to participate in DCHS' limited open forum.[4]

The plaintiffs do allege that the Roes asked their children to modify their behavior at school. ECF No. 58 at 19. Mr. Roe stated that he "requested them [sic] that they should not discuss religion at school. They should not participate in any religious activity." Jack Roe Dep. ECF No. 58-3 at 40:2–7. Similarly, Mrs. Roe is concerned that her "children will be ostracized if they don't participate in the religious fundraising that's going on in the schools." Jill Roe Dep. ECF No. 58-4 at 26:1–3. She does not allege that this has ever happened, nor does she establish any factual basis for her concern that her children might be ostracized in the future. *Id.* at 27:20–28:12. The Roes' request to their children seems to be in response to general concerns about DCHS's culture of promoting religion and not in reaction to any specific occurrences involving Roe Son. *See* Jack Roe Dep. ECF 58-3 at 26, 27:3–5 (explaining that "[t]here's nothing specific

---

[4] In order to ensure that a school provides student groups with equal access to its limited open forum, the EAA lists five standards that if met demonstrate that a school offers "a fair opportunity to students[.]" §§ 4071(c)(1–5). For example, in evaluating whether a school has offered a fair opportunity to its students, a court would look at whether "employees or agents of the school or government are present at religious meetings only in a nonparticipatory capacity." § 4071(c)(3). Teacher participation in religious groups does not, by itself, constitute a violation of the EAA. Under different facts and circumstances, the issue of teacher participation in religious student groups might be relevant to the merits of an Establishment Clause claim, but as discussed above, the Roes do not have standing to sue under the Establishment Clause.

that I'm aware of [in terms of events at DCHS], which doesn't mean it's not happening based on the attitude of the district.").

Plaintiffs argue that teacher participation in religious groups is "consistent" with DCSD's policies, so "all Plaintiffs are affected." ECF No. 58 at 19–20. The effect of this argument would be to place *any* student enrolled at *any* of the DSCD's schools within the EAA's "zone of interest" regardless of whether the individual student suffered any kind of personal injury. The Roes are clearly concerned that their children might be exposed to or impacted by the religious activities at their schools, but such broad apprehensions, no matter how understandable, do not establish standing under the EAA. The Court finds that plaintiffs do not have standing to bring their EAA claims.

### D.  Municipal Taxpayer Standing.

The Supreme Court has addressed federal, state and municipal taxpayer standing. *See ASARCO Inc. v. Kadish,* 490 U.S. 605, 613–14 (1989) (describing distinctions among them). A plaintiff generally cannot (and the present plaintiffs do not) assert standing on the basis of paying taxes to the federal government. *Frothingham v. Mellon*, 262 U.S. 447, 487–89 (1923) (holding that federal taxpayers have no standing to challenge the unconstitutional use of their tax dollars). There is a narrow exception to this ban where federal taxpayers asserting an Establishment Clause claim can challenge a specific congressional authorization of spending. *Flast v. Cohen,* 392 U.S. 83, 88 (1968). That has no application here.

A state taxpayer can establish standing when his challenge to state spending constitutes "a good-faith pocketbook action." *Doremus v. Bd. of Educ. of Hawthorne,* 342 U.S. 429, 434 (1952). In *Doremus,* state taxpayers challenged a state law that permitted the reading of the Bible in public schools. *Id.* at 430. The Supreme Court found that this did not constitute a

"direct dollars-and-cents injury." *Id.* at 434. There was no evidence that the Bible reading was funded through a "separate tax" or any "particular appropriation" or that it raised the cost of "conducting the school." *Id.* at 433. The Supreme Court emphasized that the guiding question with the good-faith pocketbook test is not whether the plaintiffs have a "religious difference" with the conduct but whether the taxpayers have the "requisite financial interest that is, or is threatened to be, injured by the unconstitutional conduct." *Id.* at 434–35.

The Tenth Circuit addressed the scope of state taxpayer standing when it considered the "good-faith pocketbook" test from *Doremus*. *Colorado Taxpayers Union, Inc. v. Romer,* 963 F.2d 1394, 1401 (10th Cir. 1992), *cert. denied,* 507 U.S. 949 (1993). The court held that state taxpayers lacked standing to challenge the state's use of funds on a campaign against a tax reform initiative. 963 F.2d 1394 at 1403. Plaintiffs rely on *Romer* in support of their claim of municipal taxpayer standing by alleging that DCSD funds were "spent for unlawful purposes." ECF No. 58 at 19 (quoting *Romer,* 963 F.2d. at 1401). But plaintiffs' reliance on *Romer* is misplaced. The *Romer* panel only addressed municipal taxpayer standing in passing and clearly distinguished between state and municipal taxpayers. 963 F.2d at 1402 (rejecting the Ninth Circuit's approach to state taxpayer standing approach "because it equates state taxpayers with municipal taxpayers for standing purposes.").

The *Romer* panel took a narrow approach to state taxpayer standing, interpreting Supreme Court jurisprudence to mean "state taxpayers must be likened to federal taxpayers." 963 F.2d at 1402. A state taxpayer must show that "money was appropriated and spent for an allegedly unlawful purpose," and "that a distinct and palpable injury resulted from the allegedly illegal appropriation or expenditure." *Id.* Such an injury exists if the taxpayer "suffered a monetary loss due to the allegedly unlawful activity's effect his tax liability." *Id.* Plaintiffs have

not satisfied these strict standards.  They have not identified how DCSD's use of its funds resulted in a "direct and palpable" injury.  Furthermore, they fail to offer any evidence that they have suffered any "monetary loss" through a change in their tax liability.

Apparently recognizing the difficulties inherent in asserting standing on the basis of being federal or state taxpayers, plaintiffs instead assert that they have "municipal taxpayer standing" to bring their claims.  ECF No. 58 at 19.  *Frothinghman* distinguished between federal and municipal taxpayer standing based on the nature of the individual taxpayer's relationship to the respective funds.  262 U.S. at 486–87.  Regarding federal taxpayers, the Supreme Court reasoned that the individual taxpayer's interest in the federal treasury is too "remote," "indeterminable," and "shared with millions of others" to constitute a case or controversy.  *Id.* at 487.  In contrast, a municipal taxpayer can have standing to challenge allegedly unlawful expenditures because his interest in the use of his tax dollars is "direct and immediate."  *Id.* at 486.  The Court likened the relationship between the taxpayer and the municipality to that of the stockholder and the corporation.  *Id.* at 487.  An injunction can be an appropriate remedy to prevent the misuse of municipal tax dollars.  *Id.* at 486.

The Supreme Court has referenced the doctrine in subsequent cases, but it has not directly defined its scope, nor has it ever afforded a plaintiff standing as a municipal taxpayer.  *See Asarco,* 490 U.S. at 613–14; *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 349 (2006) (finding that the plaintiffs could not use their status as municipal taxpayers to challenge a state franchise tax credit).  The Tenth Circuit has not directly addressed municipal taxpayer standing.  *Foremaster v. City of St. George,* 882 F.2d at 1485, 1493 n.5 (10th Cir. 1989) (finding standing due to direct economic injury and not reaching plaintiff's arguments about taxpayer standing); *Young v. Unified Gov't of Wyandotte Cnty.,* 520 F. App'x. 636, 638 (10th Cir. 2013)

22

(unpublished) (rejecting claim because taxpayer failed to allege the requirements of municipal taxpayer standing).

Other courts have taken varying approaches to municipal taxpayer standing.  It has been suggested that it no longer exists.  S*ee D.C. Common Cause v. District of Columbia,* 858 F.2d 1, 11 (D.C.Cir.1988) (Williams, J., concurring) (suggesting that "on its face" the doctrine of municipal taxpayer standing seems inconsistent with the modern approach to standing). However, most federal courts appear to consider the doctrine of municipal taxpayer standing to be good law.  *See, e.g., U.S. v. City of New York,* 972 F.2d 464, 471 (2d Cir. 1992) ("It is not our job to anticipate [how the Supreme Court will treat *Frothingham* in future opinions]. Accordingly, we join our sister circuits in finding that *Frothingham* still states the law on municipal taxpayer standing.").

Despite the lack of clear case law on this topic, a plaintiff must, at a minimum, be a municipal taxpayer who is alleging that the municipality is directing his tax dollars to unlawful practices.  *See, e.g., Young,* 520 Fed. App'x. at 638 ("Even if we give him the benefit of the doubt by assuming he alleges injury as a county taxpayer, he fails to identify any plausible allegations of illegal expenditure of taxpayer funds that would satisfy the remaining elements of municipal taxpayer standing."); *Doe v. Duncanville Indep. Sch. Dist.*, 70 F.3d 402, 408 (5th Cir. 1995) (requiring plaintiffs to show that they pay taxes "to the relevant entity" and that "tax revenues are expended on the disputed practice."); *Smith v. Jefferson Cnty. Bd. Of Sch. Comm'rs,* 641 F.3d 197, 215 (6th Cir. 2011) ("As a threshold matter, we note that Jefferson County is considered a municipality under Tennessee law.").  This simply reflects the general rule that a plaintiff must show injury, causation, and redressibility in order to establish standing.  *See D.C. Common Cause,* 858 F.2d at 5 (internal citations omitted).

Assuming without deciding that the Tenth Circuit might recognize municipal taxpayer standing under certain circumstances, this Court holds that there is no municipal taxpayer standing on the facts alleged in the present case.  First, it is not clear that the plaintiffs are challenging municipal action.  In the Supreme Court's most recent consideration of taxpayer standing, the Court did not permit the plaintiffs to "leverage the notion of municipal taxpayer standing beyond challenges to municipal action."  *Cuno*, 547 U.S. at 349 (noting that plaintiffs attempt to challenge a state tax credit as municipal taxpayers without identifying any "municipal action contributing to [the] claimed injury.").  The doctrine of municipal taxpayer standing hinges on the close relationship between the local taxpayer and the municipality such that municipal expenditures can constitute an injury for the purposes of standing.  But under Colorado law, public school districts and the school boards that administer them are considered "political subdivisions" of the state.  *Bagby v. School Dist. No. 1, Denver,* 528 P.2d 1299, 1302, 186 Colo. 428, 435 (Colo. 1974); *see also* Colo. Const. art. IX § 15 (establishing the organization of school districts and the boards of education that have "control of instruction in the public schools").  In *Bagby,* the Colorado Supreme Court held that "[a] school district is a subordinate division of the government," and it exercises "authority to effectuate the state's education purposes."  *Id.*

Second, even if these entities were considered municipalities, school districts—and by extension the school boards that oversee them—receive a mixture of state and local funds.  *Lujan v. Colorado State Bd. of Educ.,* 649 P.2d 1005, 1011 (Colo. 1982) ("Since 1935, a combination of local property tax levies and direct state contributions has been the principal source of financial support for Colorado's public school system.").  Here, in plaintiffs' one paragraph on municipal taxpayer standing, they make general allegations about the misuse of school funds.

They claim that "[f]aculty frequently use school resources, like District email and letterhead, to promote religious organizations (OCC, FCA, AIM) and events (SYATP, 'Fields of Faith.')." ECF No. 58 at 19.  Plaintiffs further attest that "[s]chool funds were directly used to provide rewards for collecting OCC boxes and cans," and that "[s]chool funds and resources (flyers, proceeds from the newspaper, etc.) were directly expended on the Mission Trip [.]" *Id.*  These allegations do not offer any insight into the source of the funds that DCSD is using for these purposes.  Plaintiffs do not provide any evidence that DCSD directed *local* tax dollars rather than *state* funds to these ends.  Given the comingled nature of the funding stream, the Court finds that the doctrine of municipal taxpayer standing is not available to the plaintiffs.

### E.  Associational Standing.

AHA is an out-of-state nonprofit that brings "this action to assert the First Amendment rights of its members."  ECF No. 1 at ¶ 5.  "An association may have standing in its own right to seek judicial relief from injury to itself and to vindicate whatever rights and immunities the association itself may enjoy."  *Warth,* 422 U.S. at 511.  Or "an association may have standing solely as the representative of its members."  *Id.* (internal citation omitted).  AHA has not alleged an injury to itself in an organizational capacity.  Therefore, to assert a claim on behalf of its members, AHA would first need to establish that "its members would otherwise have standing to sue in their own right."  *Romer,* 963 F.2d at 1397–98 (internal citation omitted).  Here, AHA cannot satisfy this requirement because I have found that none of the individuals named as plaintiffs have standing to sue.  Therefore, AHA is not entitled to associational standing.

### III.   Plaintiffs' Motion for Summary Judgment.

Because the Court finds that plaintiffs do not have standing to bring any of their claims, the plaintiffs' motion for summary judgment is denied.

**ORDER**

Plaintiffs' motion for summary judgment [ECF No. 47] is DENIED, and defendants' motion for summary judgment [ECF No. 50] is GRANTED.  The individual plaintiffs' claims in this civil action are dismissed with prejudice.  American Humanist Association's claims are dismissed without prejudice.  Final judgment will enter in favor of defendants and against plaintiffs.  As the prevailing party, defendants are awarded costs pursuant to Fed. R. Civ. P. 54(d)(1) and D.C.COLO.LCivR 54.1.

DATED this 20th day of January, 2016.

BY THE COURT:

_____

R. Brooke Jackson
United States District Judge