IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No. 14-cv-02878-RBJ

AMERICAN HUMANIST ASSOCIATION, INC.,
JANE ZOE, individually and as parent on behalf of a minor,

    Plaintiffs,

v.

DOUGLAS COUNTY SCHOOL DISTRICT RE-1,
DOUGLAS COUNTY BOARD OF EDUCATION,
ELIZABETH CELANIA-FAGEN, in her official capacity as Superintendent of Douglas County School District,
JOHN GUTIERREZ, in his official capacity as Principal of Cougar Run Elementary School, and
JERRY GOINGS, in his official capacity as Principal of Highlands Ranch High School,

    Defendants.

## ORDER

This action is before the Court on remand from the Tenth Circuit Court of Appeals for the reasons set forth in *American Humanist Association, Inc. v. Douglas County School District RE-1*, 859 F.3d 1243 (10th Cir. 2017). The Court here addresses the parties' cross-motions for summary judgment.

## I. BACKGROUND

This case, as it stands following the appellate decision, is brought by the American Humanist Association ("AHA") and one of its members whose pseudonym is "Jane Zoe." The AHA is a non-profit organization that promotes the "separation of church and state and the constitutional rights of humanists, atheists and other freethinkers." ECF No. 1 at 5. Ms. Zoe's two children attend Cougar Run Elementary School in Douglas County, Colorado. Plaintiffs

claim that defendants promote a culture of promoting the Christian religion in the Douglas County School District.

The event that is the focus of the case vis-à-vis Ms. Zoe was a Guatemala mission trip in 2014. ECF No. 50 at 6–7. The mission trip was created by and for members of a district high school's chapter of the Fellowship of Christian Athletes ("FCA"), a student club in which both students and teachers took part. ECF No. 58 at 13. The FCA planned the trip through an organization called Adventures in Missions ("AIM"), which plans Christian mission trips in both the United States and abroad. ECF No. 47 at 1. The stated goals of the mission trip were to "promote Christianity" and to "introduce [children] to the Bible." ECF No. 47-23 at 89. Fourteen high school students and two teachers participated in the trip.

Specifically as it relates to the Zoe children, in the spring semester of 2014, Cougar Run sixth-grade teacher Micki Benge volunteered to spearhead a supply drive to help fundraise for the mission trip. ECF No. 47 at 5. The supply drive was to last a week and take place during school hours. *Id.* As part of this effort, Ms. Benge printed flyers regarding the fundraiser which were sent home in students' "take home folders." This flyer stated that the supply drive was "Sponsored by Cougar Run 6th Graders partnering with the FCA (Fellowship of Christian Athletes)" and noted that "[t]his effort was born out of a desire for our 6th grade students to make real-world connections with their Latin American social studies curriculum." ECF No.1-59. Ms. Zoe's son received one of these flyers and brought it home. ECF No. 1 at 35.

In addition to the flyer, Ms. Zoe received an email from her son's preschool teacher, Camille Espinosa, encouraging participation in the supply drive. ECF No. 1-60. The email asked for supply donations for the trip and noted that "monetary donations are also welcome! Please make checks payable to Cougar Run Elementary." *Id.* The email also stated "we are

2

partnering with HRHS on this effort—specifically the FCA (Fellowship of Christian Athletes) organization" that "will be travelling to Guatemala over Spring Break to run camps for Guatemalan orphans." *Id.* Cougar Run Principal Gutierrez also emailed "Cougar Run families" informing them that Cougar Run had "partnered with [FCA]" and asked the families to donate money to the supply drive. ECF No. 1-19.

In response to an interrogatory, Ms. Zoe stated that her son "felt coerced into participating and contributing to this religious fundraiser." ECF No. 47-8 at 4 (response to Interrogatory 5). As non-Christians, the school's actions in promoting and endorsing a Christian organization . . . made us feel like outsiders and unwelcome in our own community." ECF No. 47-8. *Id.* Nevertheless, Ms. Zoe told her son that they would not be supporting the supply drive. In her deposition Ms. Zoe testified that her son was questioned and maltreated by his classmates for his beliefs underlying the reason he did not participate in the drive. ECF No. 58-2 at 10 (depo. p. 62).

In their Complaint plaintiffs asserted violations of the Establishment Clause of the First Amendment and the Equal Access Act. They sought declaratory relief, injunctive relief, nominal damages, attorney's fees and costs under the Establishment Clause and the Equal Access Act. ECF No. 1 at 44-45. However, the Tenth Circuit determined that Ms. Zoe has standing to pursue her claims only in part. She has standing to pursue a claim for violation of the Establishment Clause and to seek retrospective declaratory relief, nominal damages, and presumably, attorney's fees and costs. She does not have standing as to her claim under the Equal Access Act, and she does not have standing to seek prospective relief. *American Humanist Association,* 859 F.3d at 1253-55, 60-61. Plaintiffs seek summary judgment on the remaining claims. ECF No. 47.

Defendants ask the Court to enter summary judgment dismissing the remaining claims. *See* ECF No. 50 at 20.

## II. STANDARD OF REVIEW

The Court may grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden to show that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Here, both parties contend that the case may be resolved by a summary judgment.

## III. ANALYSIS

### A. Ms. Zoe's Establishment Clause Claim – Scope and Merits.

The Tenth Circuit left it to this Court to determine the scope and merits of Ms. Zoe's Establishment Clause claim. 859 F.3d at 1254 n.4.

1. Scope of Ms. Zoe's Claim.

Ms. Zoe asserts that the District engaged in a pattern or practice of promoting Christianity in violation of the Establishment Clause. ECF No. 1 at 40. I bear in mind the limits of what is before this Court at this time. The Tenth Circuit determined that Ms. Zoe does not have standing to seek prospective relief. Also, Ms. Zoe does not have standing to challenge activities at District charter schools (which her children do not attend or come into contact with) or a Belize mission trip organized by St. Andrew United Methodist Church (over which defendants are not responsible). *See* ECF Nos. 1 at 5 (charter school activities), and 39 (Belize trip).

The remaining events identified as constitutionally suspect in the complaint are the following: (1) the week-long supply drive hosted at Cougar Run Elementary during school

hours; (2) the flyer and emails sent to students and their parents communicating that the supply drive was "sponsored by Cougar Run 6th Graders *partnering with* the FCA (Fellowship of Athletes)" and that the "FCA students will take [the donated supplies] with them to run camps during their Spring Break mission"; (3) one week's proceeds from the Cougar Run newsletter "Press Paws" were donated to the mission trip; (4) monetary donations to support the mission trip could be made via "checks payable to Cougar Run Elementary"; and (5) the DCSD students and faculty who went on the mission trip used the supplies donated at Cougar Run to aid in their proselytizing activities. ECF No. 1 at 26, 34–39, 41; s*ee also Am. Humanist Ass'n*, 859 F.3d at 1248–49 (referencing Zoe's retrospective claims). Defendants argue that the scope of Ms. Zoe's claim—and thus the scope of the District's actions that this Court can consider in assessing whether the District violated the Establishment Clause—is limited to conduct that Ms. Zoe and/or her son personally experienced, namely the flyer and email solicitations that they received regarding the supply drive. ECF No. 103 at 2.

Plaintiffs respond that the scope of Ms. Zoe's injury went beyond the flyer and email communications and instead includes all "openly available data" regarding the District's promotion of Christianity, such as the week-long supply drive at the school and the use of said supplies on the mission trip. ECF No. 104 at 2 (quoting *McCreary Cty. v. ACLU*, 545 U.S. 844, 862 (2005) (discussing cases where government's action was held unconstitutional upon review of openly available data)). I agree with plaintiffs that the scope of Ms. Zoe's claim goes beyond the email and flyer solicitations. She brings her claim in her individual capacity as well as in her capacity as a parent on behalf of a minor, and therefore she has standing over claims involving unwanted contacts she experienced and the unwanted contacts and exposures experienced by her son. Ms. Zoe's son was present at school during the week of the supply drive, and as indicated

5

above, Ms. Zoe has indicated in discovery responses that her son felt pressure to participate in the drive and was maltreated by other children when he ultimately did not participate. Based on this exposure and the resulting injury, I find that Zoe's claim necessarily includes the fact of the supply drive.

Further, I find that the scope of Ms. Zoe's claim includes the fact of the mission trip and the use of supplies donated at Cougar Run on said trip. The FCA mission trip attendees used items collected at Cougar Run to aid in their proselytizing activities on the trip. *Am. Humanist Ass'n*, 859 F.3d at 1248–49. For example, strings and beads donated at Cougar Run were apparently used to make "Salvation Bracelets." ECF Nos. 47-19, 47-20 (testimony that beads donated at Cougar Run were used to make "Salvation Bracelets"); *see also* ECF No. 1-56 (flyer stating "FCA students will take [donated supplies] with them to run camps during their Spring Break mission to San Pedro"). Because the fruits of the supply drive hosted at Cougar Run were used to proselytize Christianity on the mission trip, and because the mission group's intention to use the donated supplies for that purpose was known by the District prior to the supply drive being hosted at Cougar Run, I find that Zoe's claim includes the use of donated supplies to proselytize on the mission trip as well.

In sum, I will assess Zoe's Establishment Clause claim by considering the flyer and email solicitations; the fact of the week-long supply drive conducted at the elementary school, including the school's decision to donate proceeds from the school newspaper to the drive; and the fact of the mission trip itself during which items solicited and donated at Cougar Run were used to proselytize Christianity.

None of these allegations directly implicate the actions of Elizabeth Celania-Fagen, superintendent of the District, or Jerry Goings, the principal of Highlands Ranch High School.

6

The claim against Ms. Celania-Fagen in her individual capacity was voluntarily dismissed. ECF No. 11. The claim against her in her official capacity is, in substance, a (duplicative) claim against the District. The claim against Mr. Goings is asserted only in his official capacity; in substance, it is a claim against the Douglas County High School.

Defendant John Gutierrez, the principal at Cougar Run, did permit the supply drive to take place at Cougar Run, and he even sent an email promoting the fundraiser to Cougar Run families. ECF No. 47-18. He admits that "funds were solicited as well as donations . . . for the mission trip" which indicates that he was aware of the religious aspect of the fundraiser to which he requested the Cougar Run families donate. *Id.*; *see Olson v. Stotts*, 9 F.3d 1475, 1477 (10th Cir. 1993) ("in order for liability to arise under § 1983, a defendant's direct personal responsibility for the claimed deprivation of a constitutional right must be established."). His decision to allow the fundraiser to take place at Cougar Run and subsequent sending of an email that promoted the Christian mission trip fundraiser from his school email address "is a choice attributable to the State, and from a constitutional perspective it is as if a state statute decreed that" the school supported the Christian mission trip. *Lee v. Weisman*, 505 U.S. 577, 587 (1992). Mr. Gutierrez's conduct is within the scope of this Court's review. Nevertheless, because he was sued only in his official capacity, the claim against him is, in substance, a claim against the Cougar Run Elementary School. The claims against defendants Munier, Koceski and Nolan were previously dismissed. ECF Nos. 11 and 36.

2. <u>Summary Judgment on Zoe's Establishment Clause Claim</u>.

Defendants seek summary judgment on the basis that plaintiffs have failed sufficiently to show a violation of the Establishment Clause.[1] ECF No. 50. Plaintiffs seek summary judgment

---

[1] Defendants also sought summary judgment on four other grounds, but these grounds have either been expressly refuted (*i.e.*, Zoe's standing, which the Tenth Circuit affirmed) or were mooted by the Tenth

7

for the opposite reason—namely, that they have established a violation of the Establishment Clause under the undisputed facts and are therefore entitled to judgment as a matter of law. ECF No. 47.

The First Amendment provides that "Congress shall make no law respecting an establishment of religion." U.S. Const. amend. I. The Establishment Clause "enshrines the principle that government may not act in ways that aid one religion, aid all religions, or prefer one religion over another." *Am. Atheists, Inc. v. Davenport*, 637 F.3d 1095, 1117 (10th Cir. 2010) (internal quotations and citations omitted). "In the absence of precisely stated constitutional prohibitions, we must draw lines with reference to the three main evils against which the Establishment Clause was intended to afford protection: 'sponsorship, financial support, and active involvement of the sovereign in religious activity.'" *Lemon v. Kurtzman*, 403 U.S. 602, 612 (1971) (quoting *Walz v. Tax Comm'n*, 397 U.S. 664, 668 (1970)).

Although the Supreme Court remains somewhat divided on the contours of the Establishment Clause, the Tenth Circuit has affirmed that "the touchstone for Establishment Clause analysis remains the tripartite test set out in *Lemon*." *Am. Atheists, Inc.*, 637 F.3d at 1117 (citing *Green,* 568 F.3d at 796). The *Lemon* test provides that "government action does not violate the Establishment Clause so long as it (1) has a secular purpose, (2) does not have the principal or primary effect of advancing or inhibiting religion, and (3) does not foster an excessive entanglement." *O'Connor v. Washburn Univ.*, 416 F.3d 1216, 1224 (10th Cir. 2005) (citing *Lemon*, 403 U.S. at 612–13). These prongs are frequently referred to as the purpose, effect, and entanglement prongs, respectively. "A governmental action violates the

---

Circuit's decision (*i.e.*, the EAA claim, which was dismissed for lack of standing; allegations regarding the charter schools SkyView Academy and Aspen View Academy, over which the Circuit noted Zoe has no standing to challenge; and a mission trip to Belize, over which the Court noted Zoe has no standing to challenge). ECF No. 50 at 1–2; *Am. Humanist Ass'n*, 859 F.3d at 1260–61.

Establishment Clause if it fails to satisfy *any* of [the] three prongs of the *Lemon* test." *Green v. Haskell Cnty. Bd. of Comr's*, 568 F.3d 784, 797–98 (10th Cir. 2009) (emphasis added).

The Tenth Circuit has applied the interpretation of the *Lemon* test provided by Justice O'Connor's concurring opinion in *Lynch v. Donnelly,* 465 U.S. 668 (1984). *See Green,* 568 F.3d at 796. Thus, "[t]he purpose prong of the *Lemon* test asks whether government's actual purpose is to endorse or disapprove of religion." *Lynch,* 465 U.S. at 690. "The effect prong asks whether, irrespective of government's actual purpose, the practice under review in fact conveys a message of endorsement or disapproval." *Id.* Both of these prongs are to be examined from the perspective of a neutral, objective observer who has knowledge of the history and context of the government action at issue. *Weinbaum v. City of Las Cruces, N.M.*, 541 F.3d 1017, 1031 (10th Cir. 2008). The entanglement prong mandates "that a challenged governmental action 'must not foster an excessive government entanglement with religion.'" *Utah Gospel Mission*, 425 F.3d 1249, 1261 (10th Cir. 2005) (quoting *Lemon*, 403 U.S. at 613).

Defendants' conduct must satisfy all three prongs in order for the Court to find that they did not violate the Establishment Clause. I will review each in turn.

    a. <u>Purpose</u>

As noted, the purpose prong probes whether defendants' "actual purpose" was to either endorse or to disapprove of religion. Courts should not engage in "judicial psychoanalysis" of the government actors' purpose. *McCreary Cty., Ky. v. Am. Civil Liberties Union of Ky.*, 545 U.S. 844, 862 (2005) (citation omitted). Rather, the court is charged with assessing "readily determinable fact" to determine what "official objective" precipitated the challenged action. *Id.* When a governmental entity professes a secular purpose for an arguably religious policy or action, the government's characterization is entitled to some deference. *Santa Fe Indep. Sch.*

*Dist. v. Doe*, 530 U.S. 290, 308 (2000). However, it is nonetheless the duty of the court to "distinguis[h] a sham secular purpose from a sincere one." *Id.*

Here, defendants assert that the "purpose" of Cougar Run's involvement with the mission trip and related fundraising activities was educational in nature. ECF No. 50 at 18. To support this argument, they point to the declaration of the supply drive organizer, sixth-grade teacher Micki Benge, who stated that the "purpose of the donation drive was for our sixth-grade students to make real-world connections with their Latin American social studies curriculum by supporting needy Guatemalan children." ECF No. 50-20 at 2. Defendants also note that the supply drive sought donations of non-secular items only, such as athletic supplies and temporary tattoos, rather than inherently religious items. ECF No. 59 at 10. Finally, they point out that Cougar Run partners with many other student clubs in their fundraising efforts, and they argue that "helping the poor is not an inherently religious activity." ECF No. 50 at 18; ECF No. 50-13 at 13:25-14:10 (Ms. Zoe's admitting that it was common to receive flyers for other fundraisers at Cougar Run).

The District supports many of its student clubs by allowing them to host fundraisers. *See* ECF No. 47-3 (District interrogatory response listing other student groups who hosted fundraisers, such as the Hip Hop Club and marching band). As to this particular fundraiser, defendants have proffered a legitimate purpose for the promotion of the supply drive. Ms. Benge stated that she organized the supply drive and fundraising efforts because she thought it would bring the Latin American social studies curriculum closer to home for her sixth-grade students.

The emails and flyers distributed to promote the supply drive cited the same educational purpose. To be sure, there is evidence of a secondary, evangelical purpose as well, as I note *infra* in discussing the effect test. But giving defendants the benefit of the doubt concerning this

prong, I do not find educational interests to be "a sham secular purpose," *Santa Fe Indep. Sch. Dist*, 530 U.S. at 308, nor do I find that the facts in the record, taken as a whole, establish that the primary purpose of defendants' involvement was to promote Christianity. It is a close call, and reasonable minds could differ. However, I conclude that defendants prevail on this prong.

      b.  Effect

However, I find that defendants fail on the effect prong. As noted, the second prong of the *Lemon* test asks "whether, irrespective of government's actual purpose, the practice under review in fact conveys a message of endorsement or disapproval [of religion]." *Lynch*, 465 U.S. at 690 (O'Connor, J., concurring). If the principal or primary effect of the given governmental action is the endorsement of a religion, the governmental action is violative of the Establishment Clause. *See Lemon*, 403 U.S. at 612. "Endorsement" in this context is akin to "promotion," *County of Allegheny v. ACLU*, 492 U.S. 573, 593 (1989), and symbolic benefit to religion is enough; it "need not be material and tangible advancement." *Friedman v. Bd. of Cty. Comm'rs of Bernalillo Cty.*, 781 F.2d 777, 781 (10th Cir. 1985).

In reviewing the alleged infringing conduct, the Court "must consider not only whether the government is actually acting neutrally, but also whether a reasonable observer, reasonably informed as to the relevant circumstances, would *perceive* the government to be acting neutrally." *Utah Gospel Mission v. Salt Lake City Corp.*, 425 F.3d 1249, 1260 (10th Cir. 2005) (emphasis added) (internal quotation marks and citation omitted). The effect prong does *not* ask "whether there is *any* person who could find an endorsement of religion, whether *some* people may be offended by the display, or whether *some* reasonable person *might* think [the government] endorses religion." *Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753, 780 (1995) (O'Connor, J., concurring in part and concurring in the judgment) (emphasis in

11

original) (internal quotation marks and citation omitted). Rather, the "reasonable observer" is, at all times, the lens through which the court assesses the effect prong of the *Lemon* test. *Id.*

Defendants argue that the effects of the supply drive and the use of said supplies on the mission trip were not religious in nature. Instead, the District argues the effects were "an increased awareness of and appreciation for poverty in a Latin American country, and a feeling of pride that [DCSD schools] sought to help poor children in an area of the world they were studying in class." ECF No. 103 at 7. I find that while the District's engagement with the supply drive and correlated mission trip may have had these effects in part, the principal effect of the District's engagement with the Guatemala mission trip supply drive was the advancement of Christianity or the reasonable appearance of such. *Capitol Square*, 515 U.S. at 780.

The very concept of a mission trip has religious intimations. The Guatemala mission trip was overtly religious. It was organized by District students and teachers who are part of the Fellowship of Christian Athletes; it was planned through a Christian organization called Adventures in Missions: Christian Mission Trips; and the fundraising page for the trip noted "our group's primary goal is to share the love and hope of Jesus." ECF No. 1-55. In addition, the student organizer of the trip testified that "the plan was to . . . introduce [children] to the Bible" and to "promote Christianity." ECF No. 47-23 at 89. It was no secret to the defendants that the supplies and money donated during the Cougar Run supply drive would be used to directly advance Christian goals.

There are cases holding that it is constitutional in some circumstances for public school students and teachers to exercise their religion and use public school spaces to do so *before and after school hours*. *See Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 121 (2001) (a Christian children's club could meet at a public school after hours); *see also Wigg v. Sioux Falls*

*Sch. Dist. 49-5*, 382 F.3d 807 (8th Cir. 2004) (holding that a public school teacher was constitutionally entitled to participate in Christian club meetings after hours in the same school building in which she taught and with some of her students). Suffice it to say that those cases have no application here. The supply drive a Cougar Run Elementary School took place during school hours over the course of an entire school week. ECF No. 47 at 5.

Further, school officials—including Ms. Zoe's son's teacher and Principal Gutierrez—used their official school email addresses to solicit monetary contributions and item donations for the Christian mission trip. ECF Nos. 1-21, 1-19. Flyers sent home with students in their "take home folders" noted that the District was "partnering with" the FCA for its mission trip. ECF No. 1-58. The email and flyer solicitations informed readers that checks to support the mission trip could be made payable to "Cougar Run Elementary." *Id.* The avenues by which these emails and flyers were sent are cause for concern in and of themselves, as the use of official public school platforms should not be intermingled with the promotion of religion. The language in the emails and flyers noting that the District was "partner[ing] with" an openly Christian organization in their proselytizing efforts is also concerning. The Establishment Clause protects against "message[s] of endorsement" of religion, so this "partner[ship]" language is quite obviously an issue. *See Lynch*, 465 U.S. at 690.

Further, the supplies collected in the supply drive were clearly intended to be taken and used on the mission trip—the flyer stated that "FCA students will take [donated supplies] with them to run camps during their Spring Break mission to San Pedro"—and indeed the beads solicited in the supply drive and donated by Cougar Run students were apparently used to make "Salvation Bracelets" to tell the story of Jesus. ECF Nos. 47-19, 47-20. As such, the items collected at Cougar Run were used to directly promote a Christian message.

13

Finally, proceeds from the Cougar Run school newspaper were donated to the mission trip fundraising efforts. The District has permitted proceeds from the school newspaper to be donated to other causes in the past, such as to the Claire Davis Memorial Fund, but the issue here is that the money directly benefitted a Christian cause. ECF No. 50-20 at 2. The Establishment Clause prohibits government financial support of religions. *Walz*, 397 U.S. at 668. Using proceeds from a public school newspaper to support a Christian mission trip is the type of financial support that the Establishment Clause prohibits. *Lemon*, 403 U.S. at 612.

In sum, this panoply of interactions between the District and religion rises to an unconstitutional level. Even giving the District the benefit of the doubt concerning whether promotion of Christianity was the District's primary actual purpose, "the practice under review in fact convey[ed] a message of endorsement" of Christianity. *Lynch*, 465 U.S. at 690. The effect of defendants' actions was to communicate to a reasonable observer that the government endorsed the Christian religion and the proselytizing of such on a Spring Break mission trip. As such, I find that defendants' actions fail on this prong of the *Lemon* test, and therefore plaintiffs' motion for summary judgment must be granted.

      c. <u>Excessive Entanglement</u>

**D**efendants fail on the final prong of the *Lemon* test as well. The entanglement prong mandates "that a challenged governmental action 'must not foster an excessive government entanglement with religion.'" *Utah Gospel Mission,* 425 F.3d at 1261 (emphasis added) (quoting *Lemon*, 403 U.S. at 613). Of course, "[t]otal separation between church and state is not possible in an absolute sense." *Id.* But contacts between the government and religion are impermissible if they are so extensive that they have "the effect of advancing or inhibiting religion." *Agostini v. Felton*, 521 U.S. 203, 233 (1997). Therefore, the court "must examine the

14

character and purposes of the institutions that are benefited, the nature of the aid that the [government] provides, and the resulting relationship between the government and the religious authority." *Lemon*, 403 U.S. at 615.

The Court finds that defendants' actions amounted to "an excessive government entanglement with religion." *Id.* Defendants supported an overtly Christian cause through financial donations, through sending emails and flyers to students' families, and through hosting the supply drive during school hours over the course of a school week. Indeed, the District itself described its relationship with the FCA and the supply drive as a "partnership." These actions and words had "the effect of advancing . . . religion." *See Agostini*, 521 U.S. at 233. As such, I find that the District fails under the third prong of *Lemon*. Because the District fails on prongs two and three, summary judgment in Ms. Zoe's favor is appropriate.

### B. American Humanist Association's Standing.

AHA is also a named plaintiff, but its standing has not yet been determined. AHA asserts associational standing based upon Zoe's standing. An association may sue on its members' behalf when: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Colorado Taxpayers Union, Inc. v. Romer*, 963 F.2d 1394, 1397–98 (10th Cir. 1992) (citing *Hunt v. Wa. State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977)). The Tenth Circuit determined that the first of these elements is met because Ms. Zoe has standing to seek retrospective relief on her Establishment Clause claim. *Am. Humanist Ass'n*, 859 F.3d at 1253–54. I find that the AHA meets the second element as well, because protecting against Establishment Clause violations in public schools is germane to the AHA's stated purpose of

pursuing the "separation of church and state and the constitutional rights of humanists, atheists and other freethinkers." ECF No. 1 at 5.

However, I find that the AHA cannot meet the third element due to the relief requested in this case. Ms. Zoe sought (and as noted above, is entitled to) nominal damages and retrospective declaratory relief. "Whether an association has standing to invoke the court's remedial powers on behalf of its members depends in substantial measure on the nature of the relief sought." *Warth v. Seldin*, 422 U.S. 490, 515–16 (1975). "If in a proper case the association seeks a declaration, injunction, or some other form of *prospective relief*, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured." *Id.* (emphasis added). However, as defined by the Tenth Circuit, Ms. Zoe is not entitled to prospective relief, and here the remedies are *retrospective* in nature only. *See Am. Humanist Ass'n, Inc.*, 859 F.3d at 1253–54. The nominal damages benefit and apply to Ms. Zoe's claim alone, and the retrospective declaratory judgment granted to Ms. Zoe is not the form of relief that extends standing to an association. *Warth*, 422 U.S. at 515–16. Therefore, the AHA cannot meet part three of the associational standing test and is thus dismissed from this case for lack of standing.

## CONCLUSION

For the abovementioned reasons, the Court GRANTS plaintiff Jane Zoe's motion for summary judgment against defendants Douglas County School District RE-1, Douglas County Board of Education, and John Gutierrez in his official capacity. The Court holds that the constitutional rights of Ms. Zoe and her son guaranteed by the Establishment Clause of the First Amendment to the United States Constitution were violated by those defendants. The Court denies defendants' motion for summary judgment as it relates to the Zoe plaintiffs but grants the

motion as it relates to the claims of the American Humanist Association.  The Court awards the Zoe plaintiffs their reasonable costs and attorney's fees pursuant to 42 U.S.C. § 1988.

The Court directs counsel to meet, confer and attempt in good faith to reach agreement on the form of judgment including reasonable amounts of costs and attorney's fees.  If the parties cannot agree on the form of judgment within 21 days of the issuance of this order, they are directed to set a hearing, including evidence concerning costs and attorney's fees.

DATED this 17th day of July, 2018.

BY THE COURT:

_____
R. Brooke Jackson
United States District Judge